THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

FILED

MAY 3 0 2017

Clerk, U.S Courts
District Of Montana
Missoula Division

| | |
|---|---|
| SAVE OUR CABINETS, EARTHWORKS, and DEFENDERS OF WILDLIFE, | CV 15–69–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| UNITED STATES FISH AND WILDLIFE SERVICE, CHRISTOPHER S. SAVAGE, Kootenai National Forest Supervisor, and UNITED STATES FOREST SERVICE, | |
| Defendants, | |
| and | |
| MONTANORE MINERALS CORPORATION, | |
| Defendant-Intervenor. | |

Plaintiffs Save Our Cabinets, Earthworks, and Defenders of the Wildlife (collectively "Plaintiffs") seek declaratory and injunctive relief under the Endangered Species Act ("ESA"), challenging determinations made by the United States Fish and Wildlife Service ("Fish and Wildlife Service") and the United States Forest Service ("Forest Service") (collectively "Federal Defendants")

1

related to the Montanore Mine Project (the "Project" or "Mine") in northwestern Montana. Plaintiffs argue that Federal Defendants violated the ESA when they concluded that the Project will not jeopardize bull trout or grizzly bears or destroy or adversely modify bull trout critical habitat. Montanore Minerals Corp. ("Montanore"), the owner and operator of the proposed mine, intervened as a matter of right. *See* Fed. R. Civ. P. 24(a)(2). This case was considered at the same time as two other cases challenging agency action in connection with the Montanore Mine. *See Save Our Cabinets v. U.S. Dep't of Agric.*, No. CV 16–53–M–DWM, and *Libby Placer Mining Co. v. U.S. Forest Serv.*, No. CV 16–56–M–DWM. Although not consolidated, argument was heard on this case in conjunction with the consolidated cases on March 30, 2017.

For the reasons set forth below, the Forest Service motion for summary judgment on Count II is granted. On all other claims Plaintiffs prevail. The Project will be remanded to the agencies for consideration in light of this Order and Opinion.

## BACKGROUND

### I.    The Montanore Mine Project

Montanore proposes to construct an underground copper and silver mine in the Cabinet Mountains Wilderness area ("the Wilderness") in the Kootenai

National Forest, approximately 18 miles south of Libby, Montana. ConsDoc:867, 880.[1] Although the ore body is beneath the Wilderness, all access and surface facilities would be located outside the Wilderness. ConsDoc:880. In addition to surface facilities, including access and ventilation sites (adits), the Project would require constructing approximately 13.7 miles of electric transmission line, waste rock storage facilities, a wastewater treatment plant, wastewater holding and seepage collection ponds, pipelines for transporting water and mine tailings, and tailing storage facilities; paving and widening of approximately 13 miles of roads; and clearing of trees and vegetation. ConsDoc:867-80. The operating permit area is 2,153 acres and the disturbance area 1,565 acres. ConsDoc:867.

The Mine is to be constructed using the "room-and-pillar" method, whereby pillars of ore are left intact to support the rock ceiling. FS6-10.1:10647. As proposed, the Project would initially consist of 12,500 tons/day underground mining operation that would expand to 20,000 tons/day. ConsDoc:565. The Mine is set to operate 24 hours per day, seven days a week, for 350 days out of the year. *Id.* It is expected to employ 450 people at full production and approximately 430 new residents could arrive in Lincoln County if the mine comports with state and

---

[1] Citations to the Fish and Wildlife Service's record are the document type followed by the page number (*e.g.*, ConsDoc:882). Citations to the Forest Service's record are "FS" followed by the volume, document number, and bates number, for example, FS6-10.1:10517.

federal laws. *Id.*

The Project involves the development of five major mining facilities: (1) a Poorman Tailing Impoundment Site north of Poorman Creek for tailings disposal, (2) the Libby Plant Site located between Libby and Ramsey creeks, (3) the existing Libby adit, (4) two additional adits in upper Libby Creek, and (5) a new 13.7 mile electric transmission line. *See* ConsDoc:564 (Figure 2), 563. Of the 13.7 miles of transmission line, ConsDoc:565, 9.1 miles are on National Forest System lands, FS6-10.1:10529. Construction of the line is estimated to take a maximum of 200 feet of clearing, and a helicopter would be used for timber removal, to place 16 structures in the upper Miller Creek and Howard Creek drainages adjacent to grizzly bear core habitat, and to string line and ground wire. ConsDoc:565.

The Project consists of four phases: Evaluation, Construction, Operation, and Closure. *Id.* In general, the Evaluation Phase is expected to last two years, Construction three to four years, Operations 16 to 20 years, and Closure/Reclamation up to 20 years. ConsDoc:566. The Evaluation Phase involves advancing the existing Libby adit and re-initiating evaluation drilling that started in 1989. *Id.* The Construction Phase consists of developing the infrastructure necessary to initiate full mining activities, including the construction for the mine adits and facilities, the transportation system, and the transmission

4

line. ConsDoc:570. All activities for the construction of the transmission line on federal lands are scheduled between June 16 and October 14, outside the spring and denning periods for grizzly bears. *Id.* The Operations Phase would consist of the actual mining and milling operations. ConsDoc:573. Following that, the Closure and Reclamation Phase is designed to establish a post-mining environment compatible with the Kootenai Forest Plan land use direction. ConsDoc:575. Closure consists of two phases, an initial phase removing most of the facilities and transmission line, and a second phase consisting of reclamation, water treatment, and monitoring. ConsDoc:565.

## II. Federal Agency Planning and Review

Discovery of mineral deposits for the Montanore Project dates back to the early 1980s. ConsDoc:865. The permitting process began in 1989 under Noranda Minerals Corporation ("Noranda"). *Id.* Noranda obtained an exploration license from the Montana Department of State Lands and other associated permits for construction of an exploration adit from private land in upper Libby Creek. ConsDoc:865-66. After construction of about 14,000 feet of the Libby adit, Noranda ceased construction in 1991 in response to elevated nitrate concentration in surface water as well as low metal prices. ConsDoc:866. By the time Noranda conveyed its interests to Newhi, Montanore's predecessor, in 2002, many of

5

Noranda's permits terminated or expired and Noranda notified the Forest Service that it was relinquishing the authorization to operate and construct the Project. *Id.* Sometime around 2006, Montanore re-opened the Libby Adit and re-initiated the evaluation drilling program that Noranda began in 1989. *Id.* The Forest Service initiated an environmental analysis that included public scoping for the proposed road use and evaluation drilling at the Libby Adit site. *Id.* But, in 2008, the agency decided the best approach for disclosing the environmental effects of the Libby Adit was to consider this activity as the initial phase for the Montanore Project. *Id.*

The lead agencies for the Project are the Forest Service and Montana Department of Environmental Quality ("DEQ"). ConsDoc:563. Forest Service authorization is required to develop the Mine because its surface facilities and access roads will be located on National Forest System land. *See* FS6-10.1:10522. Because the Project "may affect" bull trout and grizzly bear populations protected under the ESA, the Forest Service initiated Section 7 consultation with the Fish and Wildlife Service in 2011. *See* ConsDoc:864. On March 31, 2014, the Fish and Wildlife Service issued its biological opinions for the Project, finding that it is not likely to jeopardize grizzly bears or bull trout and it is not likely to destroy or

6

adversely modify bull trout critical habitat.[2] *See* ConsDoc:857-1094 ("Aquatic Opinion"); ConsDoc:554-856 ("Terrestrial Opinion"). On February 12, 2016, the Forest Service issued a Record of Decision approving the Project. FS6-10.1.

Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the ESA's citizen suit provision, 16 U.S.C. § 1540(g). *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). They challenge the March 2014 Biological Opinions and the 2016 Record of Decision. They argue that the Fish and Wildlife Service violated the ESA when it concluded that the Project will not jeopardize bull trout (Count I), or grizzly bears (Count IV), or destroy or adversely modify bull trout critical habitat (Count II). They allege the agency also violated the ESA in its use of a surrogate in the bull trout incidental take statement (Count III). Finally, they argue the Forest Service violated the ESA when it relied on the flawed biological opinions (Counts V, VI). Except for Count II, Plaintiffs have the stronger legal position on all the remaining counts.

## SUMMARY CONCLUSION

The Project is anticipated to have serious negative impacts on local

---

[2] The Fish and Wildlife Service did not designate grizzly bear critical habitat. ConsDoc:558.

populations of bull trout and an already declining grizzly bear population.

Although the 2014 Biological Opinions do not attempt to mask these serious

localized effects, the Fish and Wildlife Service acted arbitrarily and capriciously in

reaching its no jeopardy conclusions. The Forest Service's approval of the 2016

Record of Decision based on those flawed Biological Opinions violated the ESA.

## ANALYSIS

## I. Legal Standards

### A. APA

Under the APA, a "reviewing court shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.

§ 706(2)(A). The scope of review is narrow, and a court must "not [] substitute its

judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary or

capricious:

> only if the agency relied on factors Congress did not intend it to
> consider, entirely failed to consider an important aspect of the problem,
> or offered an explanation that runs counter to the evidence before the
> agency or is so implausible that it could not be ascribed to a difference
> in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011)

(quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).

An agency's actions are valid if it "considered the relevant factors and articulated

a rational connection between the facts found and the choices made." *Id.* (internal

quotation marks omitted); *Motor Vehicles Mfrs.*, 463 U.S. at 50. Although a

court's inquiry must be thorough, "the standard of review is highly deferential; the

agency's decision is 'entitled to a presumption of regularity,' and [courts] may not

substitute [their] judgment for that of the agency." *San Luis & Delta-Mendota*

*Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)). Even if

evidence is "susceptible of more than one rational interpretation," courts must

uphold an agency's findings so long as it relied on relevant evidence such that a

reasonable mind might accept as adequate to support its conclusion. *Id.*

## B. Summary Judgment

Summary judgment is appropriate where there are no genuine issues of

material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a). Summary judgment is particularly applicable to cases involving

judicial review of final agency action. *Occidental Eng'r Co. v. INS*, 753 F.2d 766,

770 (9th Cir. 1985). Summary judgment is appropriate here because the issues

presented address the legality of the agencies' actions based on the administrative

9

record and do not require resolution of factual disputes.

## II.    ESA

The ESA "obligates federal agencies 'to afford first priority to the declared national policy of saving endangered species.'" *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084-85 (9th Cir. 2005) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)). Section 7 of the ESA directs each agency to ensure, in consultation with the Fish and Wildlife Service, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or cause the "destruction or adverse modification" of habitat designated as "critical" for such species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b). The formal consultation process culminates in the issuance of a biological opinion, in which the Fish and Wildlife Service must determine—based on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2)— whether the proposed action will jeopardize the survival and recovery of a protected species. 16 U.S.C. § 1536; 50 C.F.R. § 402.02. An agency action "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly," to reduce appreciably the species' likelihood of survival and recovery "by reducing the reproduction, numbers, or distribution of the species." 50 C.F.R.

§ 402.02. The Fish and Wildlife Service also must determine whether the proposed action will destroy or adversely modify a protected species' designated critical habitat. 50 C.F.R. § 402.14(g)(4); 16 U.S.C. §§ 1532(5)(4), 1533(a)(3)(A). The Forest Service has an independent obligation under the ESA to ensure that its action is not likely to jeopardize the survival or recovery of a listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). "Arbitrarily and capriciously relying on a faulty Biological Opinion violates this duty." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) (quotation omitted).

If, as here, the Fish and Wildlife Service issues a "no jeopardy" and "no adverse modification" opinion, but determines that the action may incidentally "take" individual members of a listed species, the Fish and Wildlife Service issues an incidental take statement. 16 U.S.C. § 1532(19) ("take"); 16 U.S.C. § 1536(b)(4). The statement specifies the impact of incidental take, reasonable and prudent measures designed to minimize the impact of take, and terms and conditions to implement those measures. 16 U.S.C. § 1536(b)(4)(i)-(iv). Take that complies with the statement's terms and conditions is not prohibited. 16 U.S.C. § 1536(o)(2). The Forest Service must reinitiate consultation if the specified level of take is exceeded or if new information or a modification to the

11

action indicates previously unexamined effects. *See* 50 C.F.R. § 402.16.

## A. Bull Trout

"Despite bull trout occurring widely across a major portion of its historical potential range, many areas support only remnant [bull trout] populations." ConsDoc:890. In light of major range contraction, population declines, and ongoing threats to the species, on November 1, 1999, the Fish and Wildlife Service listed bull trout across the coterminous United States as a threatened species under the ESA. ConsDoc:885. A revised critical habitat designation was issued in 2010. *See* 75 Fed. Reg. 63,898 (Oct. 18, 2010).

### 1. The Conclusions of the 2014 Biological Opinion

The Project is expected to adversely affect bull trout local populations and critical habitat in three primary ways: (1) disruption of groundwater resources that are likely to reduce baseflow[3] in several local area streams, ConsDoc:944-45; (2) short-term increases (negative) followed by long-term reductions (positive) in stream sedimentation, ConsDoc:952-53; and (3) augmentation of warm water into streams, ConsDoc:951. The predicted reduction in baseflow is expected to reduce the size of stream flows during low flow periods, thereby disrupting access to

---

[3] "Baseflow" refers to the contribution of groundwater to a stream's flows and does not include direct runoff from rainfall or snowmelt into the stream channel. FS6-9:7823.

spawning sites and reducing the availability of adult and juvenile habitats. ConsDoc:958-59, 960-61, 975. These effects are likely to be most significant in Libby Creek, Rock Creek, and East Fork Bull River. ConsDoc:961. Short-term sediment increases are also likely to cause degradation of juvenile rearing habitats, and augmentation of warm water into streams is further likely to degrade habitat conditions and decrease bull trout survival in localized stream reaches. ConsDoc:961-62. Other actions benefit non-native fish populations that compete with bull trout. *Id.* The Project is expected to reduce the numbers, distribution, and reproduction of bull trout in local area streams. ConsDoc:961-62, 975-80.

The Fish and Wildlife Service determined, however, that based on the significance or magnitude of the localized impacts, the Project is not likely to "appreciably reduce the survival and recovery of bull trout at the scale of either the Lower Clark Fork or Kootenai River core areas." ConsDoc:981. The agency explained, for example, that the Project is not expected to eliminate fish production in Libby Creek, and several Libby Creek tributaries are not affected and will continue to provide similar contributions to the Kootenai River core area population. *Id.* Further, the Libby Creek watershed is one of six watersheds that provide for the fluvial (river-migrating) life history of bull trout, and the Project will not affect the five other primary spawning and rearing streams for that core

13

area population. ConsDoc:980-81.

Similarly, the East Fork Bull River and Rock Creek local populations are expected to continue contributing to the Lower Clark Fork River core area population, and 85 to 90 percent of the habitat within these local populations is unaffected by the Project. ConsDoc:978. Further, these two local populations represent two of the seven primary bull trout populations that support the Lower Clark Fork River core area, such that the majority of spawning and rearing habitat of the core area remains intact and usable. *Id.* While migratory fish in East Fork Bull River and Rock Creek are adversely impacted, ConsDoc:978-99, the significance of this impact is diminished by Avista's ongoing fish passage program, ConsDoc:977, 979. Considering the overall status of the core area populations, the Fish and Wildlife Service concluded that the impacts to the local bull trout populations are not likely to appreciably reduce the likelihood of survival and recovery on a larger scale. ConsDoc:978-81.

For critical habitat, the agency similarly found that the Project effects are likely to reduce, but not eliminate, the function of some of the critical habitat's essential features located in the affected streams and that the effects to the overall critical habitat available to the core area population are small. ConsDoc:984-86. The Project is expected to adversely affect 40.7 miles, or 15.1 percent, of the

14

critical habitat designated in the Kootenai River core area. ConsDoc:985. It is expected to adversely affect 16.3 miles, or 5.8 percent of the critical habitat available in the Lower Clark Fork River core area. ConsDoc:986. None of the habitat's essential features are expected to be eliminated and they will continue to contribute to the conservation function of the critical habitat. ConsDoc:985-86, 966-67. The agency also found that conservation actions, such as habitat conservation plans and the Avista fish passage program, are improving the conservation function of critical habitat and diminishing the significance of local Project impacts to the critical habitat in the core areas. ConsDoc:984-86. Accordingly, the agency concluded that the Project's adverse effects on critical habitat are not likely to appreciably diminish the ability of bull trout critical habitat to function for the conservation of the core area populations, and, in turn, are not likely to destroy or adversely modify bull trout critical habitat. *Id.*

Plaintiffs challenge the agency's conclusions on the grounds that the agency undervalued localized degradation in consideration of range-wide conclusions and relied on "uncertain" modeling.

### 2. No-Jeopardy Determination (Count I)

The central inquiry in every consultation is whether the agency action is "likely to jeopardize the continued existence" of a listed species. 16 U.S.C.

15

§ 1536(a)(2). "Jeopardy" occurs within the meaning of Section 7 when an action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Jeopardy determinations must be based on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and account for the species' current status and existing threats, the direct and indirect effects of the action, and the cumulative effects of foreseeable future actions, 50 C.F.R. §§ 402.02, 402.14(g)(2)-(3); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1063 (9th Cir. 2004). Here, the Fish and Wildlife Service concluded that the Project is "not likely to jeopardize the continued existence of bull trout, either directly or indirectly, in the wild . . . based on the magnitude of the project effects (to reproduction, distribution, and abundance) in relation to the listed population." ConsDoc:983.

### a. Consideration of Bull Trout Across its Range

According to the Fish and Wildlife Service, "[j]eopardy determinations for bull trout are made at the scale of the listed entity, which is the coterminous United States population." ConsDoc:974. The analysis employed by the Fish and Wildlife Service is based on a 2002 draft bull trout recovery plan which prescribes

16

a four-tiered hierarchal system that characterizes effects at the lowest level or
smallest scale (local population) up to the highest level or largest scale (interim
recovery units). ConsDoc:899-901, 974. The fundamental unit of analysis is the
"core area," which includes a group of one or more local bull trout populations
that, collectively, represents a biologically functioning population of bull trout and
is the best unit to consider for the purposes of recovery planning and risk analysis.
ConsDoc:896, 899. Interim recovery units, on the other hand, are larger and
encompass numerous core areas. ConsDoc:891, 901. Under the Fish and Wildlife
Service's methodology, if a project is unlikely to appreciably reduce both survival
and recovery of bull trout at a lower scale, such as a local population or core area,
by definition it could not jeopardize bull trout on a larger scale, such as the interim
recovery unit. ConsDoc:900-901, 974. The defendants insist that the agency's
methodology is due deference. *Gifford Pinchot*, 378 F.3d at 1066.

There are five interim recovery units in the United States, each of which "is
necessary to maintain the bull trout's distribution, as well as its genetic and
phenotypic diversity, all of which are important to ensure the species' resilience to
changing environmental conditions." ConsDoc:891, 901. The Project is in the
Columbia River interim recovery unit and affects two of the unit's 90 core areas:
the Kootenai River and Lower Clark Fork River. ConsDoc:894, 901 (Table 2).

Within the Kootenai River core area there are eight local populations, two of which (Libby and West Fisher Creek) are affected by the Project. ConsDoc:901. Within the Lower Clark Fork River core area, there are 14 local populations, two of which (Rock Creek and East Fork Bull River) are affected by the Project. *Id.*

The Biological Opinion reports bull trout populations within the Columbia River interim recovery unit, which contains about 500 local populations, "are at best stable and more often declining." ConsDoc:893, 894. Relying on an assessment performed in 2005, the Biological Opinion further states that the Kootenai River core area is "considered to be 'at risk' because of the very limited and/or declining numbers, range, and/or habitat, making bull trout in this core area vulnerable to extirpation." ConsDoc:895, 910 (indicating that the "apparent population strength . . . is misleading"). It further states that the Lower Clark Fork River core area is considered to be "at high risk" for the same reasons. ConsDoc:895, 922 ("Overall, current bull trout numbers in the [Lower Clark Fork River] core area are very low."). Within these core areas, the affected local

18

populations are functioning at "unacceptable risk"[4] or "at risk,"[5] *see* ConsDoc:906

(Table 4); 910-19 (Kootenai River core area); 924-930 (Lower Clark Fork River

core area), based on the application of 4 population and 19 habitat indicators

known as the Service matrix, ConsDoc:905-06 (Table 4).

The Fish and Wildlife Service found that the Project is likely to reduce the

numbers, distribution, and reproduction of bull trout in the local area streams.

ConsDoc:961-62, 975-80. The Biological Opinion states that local populations

contribute to and influence the numbers, reproduction, and distribution of the core

area populations. ConsDoc:959, 961, *see e.g.* 980-81 (discussing the relationship

between the Libby Creek population to the Kootenai River core area population).

The Fish and Wildlife Service then found that the Project is likely to reduce the

rate of survival and recovery of the core area populations. ConsDoc:959, 961.

However, the agency concluded that the localized effects would not "appreciably

reduce the survival and recovery of bull trout" at the core area scale and by

---

[4] "Functioning at unacceptable risk" means "the current baseline condition of Matrix parameters contribute to the absence of bull trout from historical habitat, or bull trout are rare or being maintained at a low population level; although the habitat may maintain the species at this low persistence level, active restoration is needed to begin recovery of the species." ConsDoc:915.

[5] "Functioning at risk" means "the current baseline condition of Matrix parameters provide for persistence of bull trout but in more isolated populations and the current conditions may not promote recovery of the species of its habitat without active or passive restoration efforts." ConsDoc:915.

19

extension, the Columbia River interim recovery unit. ConsDoc:981.

Plaintiffs insist, however, that whether an action appreciably reduces the likelihood of survival and recovery, 50 C.F.R. § 402.02, depends on both the magnitude of the project impact *and* the species' overall status. Or, in other words, "[l]ess severe project impacts are more likely to jeopardize a species whose baseline status is more severely degraded." (Doc. 54 at 10.) Accordingly, Plaintiffs argue that the agency must consider whether harm from the proposed action, on top of the degraded baseline, threatens to "tip[]" the bull trout "too far into danger." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2007). In response, the defendants argue that the ESA does not establish an affirmative duty to identify a "tipping point" for the species and that Plaintiffs overstate the agency's obligations. Federal Defendants insist that a no-jeopardy conclusion does not depend on an ample healthy population beyond the Project because Congress prohibited actions only when they *cause* a species' continued existence to be placed in jeopardy. (Doc. 60 at 8 (citing 16 U.S.C. § 1536(b)(3)(A); *Nat'l Wildlife Fed'n*, 524 F.3d at 930).) They insist that the only question is whether, given baseline conditions, the agency action "deepens the jeopardy by causing additional harm." (*Id.*) Montanore similarly emphasizes the focus on the proposed action. (*See* Doc. 49 at 15-16 (citing *Ctr. for Biological*

20

*Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1052 (9th Cir. 2015)).)

As explained in *National Wildlife Federation*, it is impermissible for an agency not to "incorporate degraded baseline conditions into its jeopardy analysis." 524 F.3d at 929. The agency must consider "whether the action effects, when added to the underlying baseline conditions, would tip the species into jeopardy," or, in other words, the agency may not "conduct the bulk of its jeopardy analysis in a vacuum." *Id.* The ESA requires that an agency "know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat"—and associated populations—"that [are] already severely degraded." *Id.* at 936, 929. Although Federal Defendants are correct that a tipping point need not be identified in every case, *Oceana, Inc. v. National Marine Fisheries Service*, 2015 WL 12697739, at *7 (D. Alaska Sept. 16, 2015), the agency complicated matters for itself here by both acknowledging the additional harm to bull trout that will occur under the Project and affirming the relative importance of the affected local populations and core areas to the interim recovery unit as a whole.

This Court's previously-decided *Rock Creek* cases are relevant to the disposition of Plaintiffs' challenges here. *See Rock Creek Alliance v. U.S. Fish & Wildlife Serv. (Rock Creek I)*, 390 F. Supp. 2d 993 (D. Mont. 2005); *Rock Creek*

*Alliance v. U.S. Forest Serv. (Rock Creek II)*, 703 F. Supp. 2d 1152 (D. Mont. 2010); *Rock Creek Alliance v. U.S. Fish & Wildlife Serv. (Rock Creek Alliance)*, 663 F.3d 439 (9th Cir. 2011). In its 2005 decision, this Court found the Fish and Wildlife Service's analysis in relation to the Rock Creek Mine was flawed because (1) it reached a conclusion as to the effect of the extirpation of the Rock Creek bull trout that was contrary to an earlier biological opinion without explaining the change and (2) it failed to consider the current status of the species "across its entire range." 390 F. Supp. 2d at 1010. That decision set aside the agency's 2003 biological opinion, and, in response, the agency issued a 2006 biological opinion and 2007 supplement. The plaintiffs once again challenged the agency's analysis, resulting in this Court's 2010 decision, *Rock Creek II*. 790 F. Supp. 2d at 1199-1200. In *Rock Creek II*, this Court concluded that the Fish and Wildlife Service met its ESA obligations both in terms of bull trout critical habitat and the agency's no-jeopardy determination. *Id.* at 1190-1205. Regarding the no-jeopardy determination, the agency "found the harm to the local bull trout population would not result in jeopardy to the Columbia River distinct population segment because the Rock Creek population is so relatively small that the damage will not register at the core area, management unit, or distinct population segment levels." *Id.* at 1205. This Court concluded that the agency's determination was rationally based

22

on the facts it found, *id.*, including the fact that extirpation of the Rock Creek
population was unlikely, *id.* at 1199-1200, 1205; the Rock Creek population was a
"relatively minor" contributor to the total core area population, *id.* at 1200; and the
success of fish passage systems, *id.* at 1200, 1202, 1203-04. The Court also
emphasized that the agency provided the explanation that was lacking from its
earlier biological opinion regarding the relative role of local populations. *Id.* at
1205. The Court cautioned, however, that its reasoning "potentially leave[s] the
species subject to 'death by a thousand pinpricks.'" *Id.* That decision was
affirmed by the Ninth Circuit in *Rock Creek Alliance*.

Here, Plaintiffs attempt to use *Rock Creek II* as a sword, while the
defendants seek to use it as a shield. Plaintiffs' argument is more persuasive.
*Rock Creek II* was a product of its facts and is distinguishable from the present
case in two primary ways: the magnitude of the anticipated negative effects and
the importance the agency itself ascribes to the affected local populations. While
*Rock Creek II* was a pinprick, the Montanore Project is a deep cut.

The Montanore Project is anticipated to have serious permanent
consequences for bull trout. In comparison, in *Rock Creek II* the agency found
that extirpation of the Rock Creek local population was "unlikely and
unanticipated" and that the Rock Creek population was a relatively minor

23

contributor to the total core area population. 703 F. Supp. 2d at 1199-1200; *see also* LIT-42539 (noting that the Rock Creek local population contributed less than 4 percent to the core area). Here, the Biological Opinion indicates the bull trout population in both the Kootenai River and the Lower Clark Fork River core areas are "vulnerable to extirpation," ConsDoc:895, and the Project effects are likely to reduce the rate of survival and recovery of both the local and core area populations, ConsDoc:959, 961. Additionally, the negative impacts from the Rock Creek Mine were largely related to sediment and were anticipated to last five to seven years. *Rock Creek II*, 703 F. Supp. 2d at 1199. The Montanore Project will have "permanent consequences" resulting in a "loss of habitat availability, particularly loss of spawning habitat," in some local populations that will result in a loss of reproductive potential at the local level and at the core level. ConsDoc:978; ConsDoc:959 (stating there will be "significant and permanent degradation to important local bull trout populations"). In addition to sedimentation, the Montanore Project is also anticipated to result in significant and permanent flow reductions. *See* ConsDoc:946 (Table 5).

The relative importance ascribed to the affected populations is also different. The *Rock Creek II* biological opinion indicated that the agency's no-jeopardy conclusion was "largely b[ased on] the strength and stability of the

24

remaining local populations." LIT-42540. The present Biological Opinion does not speak to such strength or stability; rather, the local populations are functioning at risk or at unacceptable risk. ConsDoc:906. The Biological Opinion identifies spawning and rearing success in Rock Creek and in East Fork Bull River as "essential to maintaining the existing survival status and potential for recovery of the L[ower Clark Fork core area] bull trout core area population." ConsDoc:978. It further states that "permanent consequences to both of these bull trout local populations" will occur "due to loss of habitat availability, particularly loss of spawning habitat." *Id.* "The Service anticipates a permanent decrease in recruitment from these two local populations, particularly the migratory component, which would negatively influence the recovery potential of the L[ower Clark Fork River] core area population." *Id.*; *but see id.* (recognizing "most of the available habitat (85-90 percent) for both local populations will be unaffected" and "distribution of bull trout in these watersheds is likely to stay about the same"). Of note, the *Rock Creek II* biological opinion recognized that one of the reasons the loss of the Rock Creek local population was of negligible importance to the core area was because the Bull River system, "the principal and most productive local population in the core area," remained unaffected. *See* LIT-42538; *see also* ConsDoc:8673 ("East Fork Bull River is the single-most

25

important bull trout spawning and rearing stream in the Lower Clark Fork bull trout core area."). Under the Montanore Project, East Fork Bull River faces possible permanent baseflow reductions of up to 97 percent. *See* FS6-9:8479, 7824; ConsDoc:945.

The Biological Opinion's discussion of the Kootenai River core area's dependence on localized populations is similar, noting that the status of bull trout in the core area "is tied to a few spawning and rearing streams," ConsDoc:934, the current strength of the core area population is misleading, ConsDoc:908, and that the local populations are likely to decline and "therefore decrease the numbers and reproduction of bull trout that sustain the current level of the core area." ConsDoc:959, 981. The Biological Opinion then concludes: "Without aggressive mitigation to offset these losses, it is likely they will become permanent thus increasing the challenge of survival and recovery of the Kootenai River core area bull trout population." ConsDoc:959.

The Biological Opinion also acknowledges the essential role these local populations and core areas play in the health of the species in the Columbia River interim recovery unit. It identifies the Kootenai River core area as particularly important to the interim recovery unit because it "contains a major portion (about 86 percent) of the important bull trout distribution in the Kootenai River within

26

the United States." ConsDoc:982. It also identifies the following specific conservation needs for the Columbia River interim recovery unit: "maintain or expand the current distribution of the bull trout within core areas; maintain stable or increasing trends in bull trout abundance; maintain/restore suitable habitat conditions for all bull trout life history stages and strategies; and conserve genetic diversity and provide opportunities for genetic exchange." ConsDoc:893. Indeed, the current status of the interim recovery unit is defined in terms of the health of its core areas. ConsDoc:983 (stating that all core areas within this interim unit "have been subject to the combined effects of habitat degradation[ and] fragmentation"), 892 (identifying maintenance of core areas as "[c]entral to the survival and recovery of the bull trout"). The problem with the agency's discussion is borne out by the Ninth Circuit's opinion in *Wild Fish Conservancy*, where the court concluded the agency's analysis was flawed when the agency identified the marginal health of a local population and adverse effects from the proposed action and emphasized the relative importance of a particular core area and local population but discounted the loss of the local population on a larger scale. *See* 628 F. 3d at 529.

In support of the Fish and Wildlife Service's determination, the Federal Defendants note that there are additional primary spawning and rearing

27

populations that would not be affected by the Project but support these same core areas. *See, e.g.*, ConsDoc:979 (Lower Clark Fork River core area). While the existence of such alternative sources is documented by the Biological Opinion, it does not explain the contradiction between the Fish and Wildlife Service's findings that the affected local populations play an essential role in these core areas and its conclusion that their permanent degradation, which will have a negative effect on survival and recovery in the core areas, ConsDoc:959, 961, will not affect the already degraded species, *see Oceana v. Prtizker*, 75 F. Supp. 3d 469, 491 (D.D.C. 2014) (where "baseline conditions are already dire, then even a small additional impact due to [the Project] may require a jeopardy determination"). Federal Defendants criticize Plaintiffs for not identifying support in the law for the position that the local populations are irreplaceable, but the Biological Opinion indicates that these local populations are not fungible as they provide unique value, such as genetic diversity. *See* ConsDoc:959, 961, 978.

Montanore's mitigation argument is equally unpersuasive, primarily because the agency explicitly chose not rely on most of the identified mitigation measures. *See* ConsDoc:884-85 (explaining that because of uncertainty regarding mitigation measures, only those specific sediment abatement measures "reasonably certain to occur" were considered); *Motor Vehicle*, 463 U.S. at 43 (courts may not

28

attempt to make up for deficiencies in an agency's decision by "supply[ing] a reasoned basis for the agency's action that the agency itself has not given").

The defendants' attempt to use *Rock Creek II* as a recipe book for bull trout jeopardy determinations is unavailing. As explained above, the anticipated impacts of the Rock Creek Mine and the facts surrounding the local population at issue were such that the agency's no jeopardy determination was consistent with the ESA. That same cannot be said here. Given the magnitude of the Project's effects and the self-ascribed importance of the local populations at issue, the agency's no jeopardy conclusion for bull trout was arbitrary and capricious.

### b. Stream Flow Modeling

Plaintiffs further insist that the Fish and Wildlife Service's no-jeopardy determination is arbitrary because the agency irrationally evaluated the significant threat to bull trout from mining-induced stream flow reductions, failing to "give the benefit of the doubt to the species" as required by the ESA. (Doc. 35-1 at 24) (quoting *League of Wilderness Voters v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014)).) The Project is expected to alter stream flows in several ways, including by mining activities, pumpback well system operations around the impoundment site, evaporative losses, diversions from Libby Creek during high flows, discharges from the water treatment plant into Libby Creek, vegetation

clearing, and potable water uses. ConsDoc:944; FS6-9:7825. Underground

mining also alters stream flows, by creating underground voids that intercept and

drain groundwater resources, reducing the amount of groundwater available to

discharge into streams, springs, and lakes. FS6-9:8398, 8509 (Chart 17).

The agencies relied primarily on a three-dimensional (3D) groundwater

model to characterize predicted baseflow depletions to evaluate the Mine's impact

on stream flows. ConsDoc:944-45. Based on the model results, mining is

expected to reduce baseflows in the long-term or on a permanent basis by more

than 20 percent in Libby Creek at the Wilderness boundary, by 11.6 percent in

Poorman Creek, by nearly 9 percent in East Fork Rock Creek, by 7.7 percent in

mainstem Rock Creek, and by nearly 13 percent in East Fork Bull River.

ConsDoc:946-47, 914 (map). With some exceptions (Libby Creek), baseflow

reductions are expected to reach their maximum levels after mining is complete

(during Closure or Post-Closure Phases). ConsDoc:946-47 (Table 5). Because

baseflows are estimated to persist for 1,200 to 1,300 years, the agencies treated

projected depletions as permanent. FS6-9:7824; ConsDoc:945.

According to the agencies, the 3D model's results "are the best currently

available estimates of impacts and associated uncertainty that can be obtained

using groundwater models." ConsDoc:944; FS6-9:7822, 8195. The 3D model

"provides a more detailed analysis [than other models], by incorporating known or suspected fault behavior with respect to hydrology; more recent underground hydraulic testing results; a more comprehensive calibration process; and better simulation of vertical hydraulic characteristics of the geologic formations to be encountered during the mining process." FS6-9:8445. The 3D modeling characterized the maximum effects expected to occur to aquatic populations during periods when groundwater inflows comprise most or all of stream flow (generally mid-July through October and November through March). ConsDoc:944; FS6-9:8195. The Fish and Wildlife Service recognized the uncertainty present in the model's results, ConsDoc:944-45, noting that actual changes to baseflow "could be much greater or lesser because model predictions cannot capture all the real world complexities of the hydrogeological relationships between groundwater and surface water." ConsDoc:975-76. The agencies indicated that uncertainty would be reduced and the model refined after the Project collects additional data during the Evaluation Phase, ConsDoc:944-45; FS6-9:7822, 7999, which could trigger additional environmental review and ESA consultation before future phases commence, ConsDoc:944-45; FS6-10.1:10622.

Plaintiffs argue that while the agency conceded that the model results were highly uncertain and that actual flow reductions may prove "much greater,"

31

ConsDoc:975-76, it acted arbitrarily in failing to consider how greater reductions would impact bull trout. Plaintiffs also argue the agency ignored predictions of a baseflow reduction of up to 97 percent in East Fork Bull River. Contrary to Plaintiffs' position, the agency permissibly used an imperfect model and its analysis of the model results is not arbitrary and capricious.

"[Courts] defer to an agency decision not to invest the resources necessary to conduct the perfect study, and [courts] defer to a decision to use available data unless there is no rational relationship between the means [the agency] use[d] to account for any imperfections in its data and the situation to which those means are applied." *San Luis*, 747 F.3d at 620 (internal quotation marks omitted). "The existence of a flaw" does not mean the use of a model is arbitrary, "[r]ather, [courts] will reject an agency's choice of a scientific model only when the model bears no rational relationship to the characteristics of the data to which it is applied." *Id.* at 620-21 (internal quotation marks and citations omitted). That is not the case here. The agencies provided a reasoned explanation as to why the 3D model was used, what uncertainties exist, and why the resulting baseflows were relied upon.[6] ConsDoc:945; ConsDoc:6561-63 (discussion of model in Biological

---

[6] Montana DEQ further explained that the "data would normally be obtained via drilling from the surface and the installation and testing of monitoring wells. But, because the Montanore deposit is located beneath a wilderness, data collection via drilling from the surface is

Assessment); FS10-237:13494 (outlining EPA concerns regarding uncertainties). "Although the [agency] cannot act on pure speculation or contrary to the evidence, the ESA accepts agency decisions in the face of uncertainty." *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164; *see Connaughton*, 752 F.3d at 763-64 (as long as agency considered relevant evidence, evidence may be "imperfect"). The uncertainty in the modeling alone does not make the agencies' reliance arbitrary.

The model results are also conservative. *See* ConsDoc:948 (describing the model as "a conservative assessment of potential impacts of changes to streamflow during low flow conditions in bull trout occupied streams"). The Biological Opinion explains that the results depicted in Table 5 are those that occur during the time "when run-off from precipitation and groundwater components are at the lowest point," and that "[t]hese time periods coincide with the most sensitive time periods for bull trout" due to spawning and egg incubation. ConsDoc:944. Because the model assumes little to no additional streamflow from surface water or runoff, that conservative assessment is supported by the record. *See also* FS42-136:50409 (model developer describing it as "conservative"); FS42-122:49681 (same). "[T]he Supreme Court has held that an agency may choose to 'counteract

---

not practicable." FS6-11.1:11017. Even so, the DEQ held approval of future phases of the Project in abeyance pending further hydrogeologic data. FS6-11.1:11-17.

the uncertainties' inherent in its scientific analyses by 'overestimat[ing]' known parameters without being unreasonable, and [the Ninth Circuit] ha[s] upheld an agency's reliance on models that 'yield conservative data because the models incorporate the higher of [known potential values] in assessing the overall risk.'" *San Luis*, 747 F.3d at 610 (quoting *Balt. Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87, 103 (1983) and *Nw. Coal. For Alts. To Pesticides v. U.S. E.P.A.*, 544 F.3d 1043, 1050 (9th Cir. 2008)) (internal citations omitted).

Montanore also notes that potential flow reductions will be reevaluated prior to the Construction and Operation Phases of the Project, allowing for greater certainty. (Doc. 49 at 26.) In order to rely on future plans, the record must "show a clear, definite commitment of resources" for the future improvements. *Nat'l Wildlife Fed'n*, 524 F.3d at 935-36. According to the agencies, the model will be revised and updated based on site-specific data in the Evaluation Phase and prior to mining activity, ConsDoc:944-45, 1016, and rigorous monitoring will occur during the Project, FS6-10.1:10531-32, 10739 (Attachment 3); ConsDoc:944-45; FS 6-9:7822; FS6-10.1:10622. However, the Fish and Wildlife Service did not rely on this "adaptive management approach" in its Biological Opinion. *See* ConsDoc:1016. Rather, the Fish and Wildlife Service "analyzed the effects of implementing the Plan as proposed," recognizing that if new data and modeling

34

occurs in the future it "would likely require reinitiation of Section 7 consultation, a new jeopardy analysis and preparation of a revised [biological opinion]." *Id.*; *see also* ConsDoc:997 (Reinitiation Notice). The Fish and Wildlife Service's jeopardy determination is properly based on existing data, not speculation as to what data may exist in the future. *Wild Fish Conservancy*, 628 F.3d at 525.

Plaintiffs further insist the agencies ignored data resulting from the 3D model, specifically the predicted baseflow reduction of up to 97 percent in East Fork Bull River. *See* FS6-9:8308. An agency "cannot ignore available biological information." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 1972) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)). The flow monitoring site at issue is known as EFBR-300 and it is located on the upper reaches of East Fork Bull River. *See* FS6-9:9559. As noted by the defendants, the monitoring location is not occupied by bull trout and is not designated as critical habitat. *See* FS6-9:8237; *compare* FS6-9:9555 (Figure 55) (showing critical habitat does not extend up the reach to St. Paul Lake) *with* 9557 (Figure 56, showing "EFBR 300" below St. Paul Lake); *but see* ConsDoc:939 (Figure 14 (showing extension of designated bull trout critical habitat all the way to source of East Fork Bull River or possibly omitting St. Paul lake stretch). However, Plaintiffs point out that EFBR-300 is the closest monitoring site to Placer Creek,

35

there is no other upstream monitoring site between Isabella Creek and Placer Creek—which is designated critical habitat and bull trout occupied—and 80 percent of redds occur inside the Wilderness boundary. *See* FS6-9:9555, 9585; ConsDoc:8673. Plaintiffs further argue that because "[t]he greatest percentage of baseflow reductions were predicted in the upper reaches of [project area] streams," it was irrational to ignore data regarding those upper reaches. *See* ConsDoc:948.

Federal Defendants argue that the fact EFBR-300 registered a 97-percent reduction was not considered because (1) the 3D modeling was not designed to accurately predict impacts to the uppermost reaches of these streams where baseflows are low and variable and (2) uncertainty of perennial stream flow. Those explanations are borne out by reports provided by AMEC Geomatrix, Inc., the company that developed the 3D model. *See* FS42-122:49500 (discussing background on model). AMEC Geomatrix, Inc. specifically noted that predicted changes in baseflows at EFBR-300 "have a high degree of uncertainty," FS42-122:49515 (April 2011 Revised Report), and that East Fork Bull River "becomes perennial" below EFBR-300, and that "[d]ue to uncertainty of perennial stream flow" at EFBR-300, "it seems prudent to remove these stream reaches as transfer boundaries from the model so that there is no direct connection of surface water with regional groundwater in the model," FS42-130:50269 (October 2011

36

Summary). Plaintiffs persuasively argue that Federal Defendants' position is flawed, however, because that explanation was not put forth by the agency. *See Pac. Coast Fed'n of Fishermen's Ass'n*, 426 F.3d at 1091 (holding that review of record opinion is limited to what agency "*actually said*").

Plaintiffs are correct that EFBR-300 is not addressed in the Biological Opinion. *See* ConsDoc:946-46 (Table 5: streamflow chart), 914 (Figure 9: streamflow monitoring sites). However, it appears the streamflow data in the Biological Opinion was at least in part adapted from the Forest Service's 2013 Biological Assessment. *See* ConsDoc:6518-6828; *see* ConsDoc:914. That Assessment explains that as part of its approach to the 2011 streamflow data provided by AMEC Geomatrix, "reaches from the assessment that are not suspected to support bull trout" were eliminated. ConsDoc:6563. And, although the Assessment notes that bull trout are "considered to occur upstream in Placer Cr[eek]," the Forest Service placed the confluence with Placer Creek as the upper limit for bull trout. *See* ConsDoc:6620 (Table 5.4.2.1.1); *see also* ConsDoc:6656 (Figure 5.3.2-1 (noting that "occurrence & critical habitat [of bull trout] continue up Placer C[reek] from confluence")). As a result, it appears EFBR-300 was omitted from the Assessment's consideration—and therefore the Biological Opinion—not because of the uncertainty of streamflow predictions at that

location, but because it was not considered bull trout-occupied. The Final EIS provides some support for this conclusion where in response to comments on this issue the agencies stated: "Bull trout do not inhabit the extreme upstream reaches of these streams." FS6-9:10313-14. Plaintiffs' argument regarding the potential existence of bull trout redds inside the Wilderness boundary above Placer Creek or near the EFBR-300 monitoring site does not undercut this conclusion because existing data, relied on by the agency, solely shows redds downstream of Placer Creek and EFBR-2, an additional monitoring site within the Wilderness boundary. *See* ConsDoc:6660. Because the record shows a valid reason for not considering flow at EFBR-300 in the bull trout analysis—i.e., the absence of bull trout from that stream stretch—the omission does not render the agency's analysis arbitrary or capricious. *Connaughton*, 752 F.3d at 764 (upholding agency decision where "supported by a reasonable reading of the evidence").

### 3. Critical Habitat (Count II)

Plaintiffs further argue that the Fish and Wildlife Service failed to rationally consider the degraded status of bull trout critical habitat region-wide or assess the levels of habitat abundance and diversity that are necessary to conserve the species. In 2010, the Fish and Wildlife Service designated 18,975 miles of streams and 488,252 acres of lakes and reservoirs as critical habitat for bull trout.

38

ConsDoc:896 (Table 1). The Fish and Wildlife Service's analysis of critical habitat follows a similar hierarchical approach to that used in the jeopardy context. ConsDoc:896, 899-900. Bull trout critical habitat is divided into 32 critical habitat units, each of which encompasses one or more core areas. ConsDoc:896.

The Project lies within the Kootenai River Basin and Clark Fork River Basin critical habitat units. ConsDoc:902, 904 (Table 3). The Project affects critical habitat in two streams within the Clark Fork River Basin critical habitat unit, Rock Creek and East Fork Bull River. ConsDoc:904. The Project affects critical habitat in three streams in the Kootenai River Basin critical habitat unit, Libby Creek, Bear Creek, and West Fisher Creek. *Id.* The Fish and Wildlife Service determined that the Project is "not likely to destroy or adversely modify bull trout critical habitat" based on the "relatively small amount of designated critical habitat" at issue and the "fact that the impacted area[s] will still support the [primary constituent elements ("PCEs")]." ConsDoc:983, 985 (Kootenai River), 986 (Clark Fork River).

Critical habitat units generally encompass one or more core areas and their primary function is to maintain and support those core areas. ConsDoc:896. Within designated critical habitat areas, the PCEs make up "th[]e physical and biological features that are essential to the conservation of a given species." 50

C.F.R. § 424.12(b); 16 U.S.C. § 1532(5)(A). There are nine PCEs for bull trout, including, *inter alia*, healthy migration habitats, proper composition of spawning and rearing areas, a natural hydrograph, water quality, and low levels of non-native species. ConsDoc:897. The Fish and Wildlife Service found the Project will "permanently reduce the functional ability" of critical habitat to satisfy bull trout conservation needs in Libby, Bear, West Fisher, Rock Creek, and East Fork Bull River "to a significant degree," ConsDoc:983-84, and that some PCEs "are expected to be permanently 'degraded' over existing conditions," ConsDoc:984. But, the agency determined these impacts will not rise to level of destruction or adverse modification because the affected areas represent a fraction of critical habitat across the Columbia River interim recovery unit, ConsDoc:983, and "the degraded condition of some PCEs will not be to the extent that the critical habitat will not be able to support the viability of the respective Core Area bull trout populations," ConsDoc:984.

As was the case with the agency's jeopardy determination, Plaintiffs' challenges to the agency's conclusion were previously addressed in *Rock Creek II*, 703 F. Supp. 2d at 1195-99, and in *Rock Creek Alliance*, 663 F.3d at 442-44. In the Rock Creek case, the agency concluded that the PCEs in the affected area were expected to remain functional, albeit at a lower level, and that the most significant

40

impacts would last five to seven years. *Id.* at 442-43. Relying on *Gifford Pinchot*,

both this Court and the Ninth Circuit concluded the agency's analysis was

sufficient because "it did not attempt to hide the local impacts of the action, but

considered them in detail." *Id.* at 443. As explained in *Rock Creek II*,

A reasonable conclusion to be drawn from *Gifford Pinchot* is that degradation, or even elimination, of critical habitat on a small scale does not constitute adverse modification provided (1) the affected area is insignificant relative to the total designated critical habitat; (2) the localized effects are fully discussed in the biological opinion; and (3) the use of a large-scale analysis does not mask multiple site-specific effects that pose a significant risk to the species when considered in the aggregate.

. . .

Where large-scale critical habitat is properly relied upon as contemplated in *Gifford Pinchot*, the negative effects on localized critical habitat become largely irrelevant; even the loss of critical habitat can result in a "no adverse modification" determination if large-scale analysis is properly relied upon in accordance with *Gifford Pinchot*.

703 F. Supp. 2d at 1198-99. This Court then emphasized that the Rock Creek

critical habitat, while "suffer[ing] diminished functionality in the short term,"

would "not be so degraded that it becomes non-functioning." *Id.* at 1199. Of

note, the critical habitat at issue in *Rock Creek II* was 2.88 miles. LIT-42523.

Here the dispute focuses on *Rock Creek II*'s first requirement, which

contemplates the relative significance of the affected area. Plaintiffs argue that

discounting impacts as insignificant based on bare percentages improperly ignores

41

the value of the habitat. *See* 50 C.F.R. § 402.02 (destruction or adverse modification occurs when an action "appreciably diminishes the *value* of critical habitat for the conservation of a listed species" (emphasis added)). Contrary to Plaintiffs' position, the Fish and Wildlife Service adequately explained both the magnitude and relative value of the critical habitat at issue. The Fish and Wildlife Service considered the fact that anticipated impacts would be confined to only 40.7 miles (24.2 in Libby Creek, 8.2 in Bear Creek, 8.3 in West Fisher Creek) or 15.1 percent of designated critical habitat in the Kootenai River core area, or 0.2 percent of the total Columbia River basin stream miles of designated critical habitat. ConsDoc:985. And, effects would be confined to only 16.3 miles (8.4 in Rock Creek and 7.9 in East Fork Bull River) or 5.8 percent of designated critical habitat in the Clark Fork River core area, or less than 0.1 percent of the total Columbia River basin stream miles of designated critical habitat. ConsDoc:986. While the amount of critical habitat at issue here is indisputably larger than that which was at issue in the Rock Creek case—almost 60 miles versus 2.88 miles —"[a]n area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival and recovery." *Butte Envtl. Council*, 620 F.3d at 944, 947-48 (upholding "no adverse modification" finding where project would destroy 234.5 acres of vernal pool

42

tadpole shrimp habitat where agency concluded it was "only a very small percentage" of the species' habitat).

Moreover, the Biological Opinion does not attempt to hide localized risk within large-scale analysis, as was the concern in *Gifford Pinchot*. 378 F.3d at 1075. The Fish and Wildlife Service found that the Project is likely to adversely affect critical habitat within the Kootenai River and Clark Fork River critical habitat units. ConsDoc:902, 904 (Table 3). Through baseflow reductions, sedimentation, warm water augmentation, and actions that benefit non-native species, the Fish and Wildlife Service found that the Project is likely to reduce the function of some the PCEs. ConsDoc:984-85, 966-67 (Libby Creek), *id.*; 970-71 (Rock Creek and East Fork Bull River). But, it ultimately found those affected PCEs would remain functional at the local level and therefore would not impact critical habitat on a larger scale. *See* ConsDoc:984-86. That conclusion is adequate under *Gifford Pinchot*, *Rock Creek II*, and *Rock Creek Alliance*.

As was the case with the Fish and Wildlife Service's jeopardy conclusion, the agency complicated matters by identifying the core areas at issue as providing "essential" critical habitat for the species. The Fish and Wildlife Service found that the Kootenai River Basin critical habitat unit "is *essential* to bull trout recovery because it contains the strongest adfluvial core area population across the

43

range of the species and also supports the single largest spawning run of adult bull trout in Wigwam River, British Columbia." ConsDoc:902 (emphasis added) (internal citation omitted). Additionally, it found the Lower Clark Fork critical habitat sub-unit "*essential* to bull trout conservation because it provides an important portion of the spawning and rearing habitat for Lake Pend Oreille, as well as an *essential* migratory corridor for bull trout from Lake Pend Oreille to be able to access productive watersheds upstream." ConsDoc:903 (emphasis added); *see also* ConsDoc:904 (Table 3) (defining these units and subunits "as *essential* for the survival and recovery of the species *across the range of the species*" (emphasis added)). However, the agency adequately explains what PCEs will be diminished and what PCEs will remain and whether they are sufficient to support the species. *See, e.g.*, ConsDoc:966 (discussing impacts on PCEs in Libby Creek). In doing so, the agency properly identified the "capability of the critical habitat to satisfy essential elements of the species." *Butte Envtl. Council*, 620 F.3d at 948 (quotation omitted). Therefore, unlike the agency's jeopardy analysis, the Biological Opinion provides qualitative support—as opposed to mere quantitative conclusions—for the agency's determination.

In sum, the agency's finding of no adverse modification or destruction of critical habitat is neither arbitrary nor capricious. The agency adequately

considered the serious localized effects of the Project in light of the baseline for bull trout critical habitat. Although Plaintiffs disagree with the agency's conclusion, it is supported by the record.

## 4. Incidental Take Statement (Count III)

Where, as here, an agency determines an action will not jeopardize a listed species or destroy or adversely modify critical habitat, but is likely to result in incidental take, the agency must provide an incidental take statement. 16 U.S.C. § 1536(b)(4);50 C.F.R. § 402.14(i)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The taking of protected species is prohibited unless specifically authorized in an incidental take statement. 16 U.S.C. § 1538(a)(1)(B). The amount of take authorized in the statement serves as a "'trigger' that, when reached, results in an unacceptable level of incidental take." *Ariz Cattle Growers Ass'n*, 273 F.3d at 1249. The Fish and Wildlife Service is required to "specif[y] the impact of such incidental taking," 16 U.S.C. § 1536(b)(4)(i), which can be done numerically or, where impractical, through a surrogate, 50 C.F.R. § 402.14(i)(1)(i).[7]

---

[7] After the Fish and Wildlife Service issued the Biological Opinion it revised its regulations on the use of surrogates in an incidental take statement by "codifi[ng] existing practices," 80 Fed. Reg. 26,832, 26,844 (May 11, 2015), which does not affect the analysis here.

Here, the Fish and Wildlife Service issued an incidental take statement explaining that "[p]redicted stream baseflow depletions, short-term increases in sediment input to bull trout streams, and 'warm water' augmentation of outflow of the Libby Adit Water Treatment Plant to Libby Creek" are "likely to result in adverse impacts to individual bull trout and depression of numbers in local populations." ConsDoc:987. "[H]owever, the amount of incidental take is not anticipated to be of the magnitude to decrease survival to the extent it would eliminate bull trout altogether in any of the affected reaches." *Id.* The Biological Opinion explains that take in this context is difficult to quantify because it is difficult to estimate how many bull trout are in the vicinity of Project and the impacts can have different effects on different types of habitat (e.g., spawning habitat versus egg incubation gravels). ConsDoc:988. For those reasons, the agency concluded that "the actual amount or extent of the anticipated incidental take due to changes in habitat conditions in the affected streams is unquantifiable." ConsDoc:989. As a result, the agency used "the extent and magnitude of stream flow depletions," "warm water flow augmentation," and "sediment loading" as a surrogate to "measure the amount and extent of take." *Id.*

As noted by Federal Defendants, Plaintiffs do not dispute the Fish and Wildlife Service's determination that it could not provide a numerical limitation

on take due to the lack of data and impracticalities of monitoring. ConsDoc:989; *see Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127 (9th Cir. 2012) (generally noting that the use of surrogates is appropriate in considering fish populations). Instead Plaintiffs challenge the agency's reliance on baseflow reductions because of the uncertainty surrounding the extent of those reductions and the lengthy time period it will take for those effects to be known.

First, Plaintiffs once again argue that the Fish and Wildlife Service ignored evidence that baseflow reductions in East Fork Bull River will greatly exceed predictions in the Biological Opinion because the incidental take statement says that maximum baseflow reductions will not exceed 12.9 percent, ConsDoc:991, but the groundwater model indicates up to 97 percent, *see* FS6-9:8308. Plaintiffs' argument is unpersuasive for two reasons. First, as discussed above, the reaches at issue are not bull trout occupied. The agency is not required to assess take where it will not occur. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1242. Second, Plaintiffs' concern is mooted by the parameters of the incidental take statement: "Take will be exceeded if the measure level of baseflow depletions exceeds the predicted baseflow depletions for each stream (see Table 5) and each 'Streamflow Impact Estimate Location' (see Figure 9). Take will also be exceeded if the length of affected stream reach is more than that described for each affected stream."

47

ConsDoc:991. If baseflow reductions in the East Fork Bull River exceed 12.9 percent, well below the 97 percent argued, reinitiation will be required.

Plaintiffs maintain, however, that because flow reductions "aren't predicted to occur until well after mining is completed," ConsDoc:945, the incidental take statement is arbitrary and capricious in that it would not allow the Fish and Wildlife Service to halt the Project and reinitiate consultation. The defendants argue that baseflow reductions are expected not only at the conclusion of the Project, but are expected to occur to varying degrees during all Project phases, *see* ConsDoc:946-47 (Table 5), and further emphasize the requirement that the models be updated and revised with new data gathered during the Evaluation Phase, *see* FS6-9:7822, 7999, 8487; FS6-10.1:10529-32, 10780-10829. Essentially, because the baseflows are monitored and identified at each stage, reinitiation would be "triggered" if necessary. Plaintiffs challenge this assertion, noting that while flow reductions are expected during the Construction Phase, they will not be "observable" until later and the *maximum* reductions are not expected until Post-Closure. ConsDoc:945-47. Plaintiffs' concern has merit.

There is no question that the agency has identified both a metric and a robust monitoring plan under the Project. *See* ConsDoc:996, 1077-94. However, much like the situation in *Oregon Natural Resources Council v. Allen*, 476 F.3d

48

1031, 1039 (9th Cir. 2007), measurable take is not expected to occur until the Project is complete, during the Closure and Post-Closure phases. *See* ConsDoc:945. Thus, like *Allen*, even if take were exceeded at that point, the incidental take statement would not permit the Fish and Wildlife Service to halt the Project to meaningfully reinitiate consultation. *Compare with Swan View Coalition v. Barbouletos*, 2008 WL 5682092, at *14 (D. Mont. Mar. 31, 2008) (holding incidental take statement provided adequate "trigger" in part because included deadlines for road density and core habitat standards for grizzly bears).

Although the Fish and Wildlife Service's use of a surrogate is not by itself arbitrary and capricious, because the extent of the baseflow reductions will not manifest until the Closure and Post-Closure Phases, the Project's reliance on baseflow reductions does not provide sufficient "triggers" violating the ESA.

## B.    Grizzly Bears (Count IV)

In 1975, the Fish and Wildlife Service listed the grizzly bear as a threatened species in the contiguous United States. ConsDoc:576. It subsequently developed a grizzly bear recovery plan in 1982, and revised it in 1993. *Id.* Since the original listing of the grizzly bear, the Fish and Wildlife Service has completed three 5-year status reviews. ConsDoc:576-77 (1981, 1987, and 1991). At the time the Biological Opinion was written, the Selkirk Ecosystem and Cabinet Yaak

Ecosystem populations were warranted for reclassification from threatened to endangered status but precluded by higher priority actions.[8] ConsDoc:577.

The Cabinet-Yaak Ecosystem is one of six recovery zones the Fish and Wildlife Service identified to evaluate grizzly bear recovery in the lower-48 states. ConsDoc:558, 588.[9] It is approximately 2,609 square miles in size and is located primarily in northwestern Montana with small portions in northern Idaho. ConsDoc:592. Landownership is approximately 90 percent Federal, 5 percent State, and 5 percent private. *Id.* The relative distribution of grizzly bears across the Cabinet Yaak is unknown, but is believed to be proportionate to land ownership. *Id.* Within the Cabinet Yaak recovery zone, 5.6 percent (94,272 acres) is designated Wilderness. *Id.* The Cabinet Mountains lie south of the Yaak River drainage and contain about 60 percent of the recovery zone and makes up the Project's "action area." ConsDoc:611. There are approximately 1,500 grizzly bears in the lower 48 states, including 42 in the Cabinet Yaak recovery zone, and

---

[8] Of note, on December 5, 2014, the Fish and Wildlife Service decided that the Cabinet Yaak population was not warranted for listing. 79 Fed. Reg. 72450, 72488 (Dec. 5, 2014). A challenge to that determination is pending. *See All. for the Wild Rockies v. Jewell*, CV 16–21–M–DLC.

[9] The other zones include the Greater Yellowstone Area, the Northern Continental Divide Ecosystem, the Selkirk Ecosystem, the Bitterroot Ecosystem, and the North Cascades Ecosystem. ConsDoc:589 (Figure A2). The Bitterroot Ecosystem does not contain a grizzly bear population at this time. ConsDoc:591.

an estimated 21 in the Cabinet Mountains portion of that zone. ConsDoc:612.

Best available data shows a 57 percent probability that the population is declining

at a rate of 0.8 percent annually. ConsDoc:589, 592, 598. Data from the past six

years indicates the probability of decline has improved since 2006.[10]

ConsDoc:598 (Table A4), 599, 592.

Here, the Fish and Wildlife Service concluded the adverse impacts of the

Project are expected to result in the loss of no more than one grizzly bear and

temporarily impact female reproduction in the Project area. ConsDoc:639, 647,

674. These effects are expected to be caused by direct loss of habitat, disturbance

and fragmentation, and increased human presence and activity. ConsDoc:620,

630-73. Based on its analysis, the Fish and Wildlife Service concluded that the

Project "is not likely to jeopardize the continued existence of the listed entity of

grizzly bears." ConsDoc:557.

Plaintiffs' challenge to the grizzly bear Biological Opinion focuses

primarily on mortality. Plaintiffs argue that the Fish and Wildlife Service's

convenient determination that the proposed mitigation measures will more than

neutralize the threat of human-caused bear mortality is arbitrary for three reasons.

First, the Biological Opinion concedes that "[n]o empirical data is available with

---

[10] It is based on this fact that the defendants argue that the population is improving.

51

which to accurately predict the number of grizzly bear mortalities as a result of the proposed mine over 30 years," ConsDoc:662, but the Fish and Wildlife Service concluded that the Mine will "result in no more than one grizzly bear mortality over the 30-year life of the mine," ConsDoc:664. Second, while the Fish and Wildlife Service states mitigation will "prevent the human-caused mortality of more than one female grizzly bear over a 30-year period" "more than offsetting the loss [] anticipate[d] from the project (one grizzly bear)," it cites no data to support that conclusion. ConsDoc:648-64, 690. Finally, Plaintiffs argue that the Fish and Wildlife Service failed to consider evidence that the planned mitigation measures would be inadequate to offset mortality threats. The defendants argue that the agency properly considered all the mortality data and rationally quantified the expected take based on that data, and that the agency's interpretation and conclusion is entitled to deference. They further argue that mitigation measures implemented under the Project will be net beneficial for grizzly bears and cause a net reduction in human-caused mortality.

Bear mortality has the greatest impact on potential growth rates and extinction probabilities. ConsDoc:609 (comparing with augmentation and linkage enhancement). "Improving survival by reducing human-caused mortality is crucial for recovery of this population." ConsDoc:592-93. In the entire Cabinet

Yaak recovery area in the last 30 years there have been a total of 65 known grizzly bear mortalities (48 in the United States), or slightly more than 2 bears per year. ConsDoc:601. Of those, 49 (75 percent) were human caused and 16 (25 percent) were natural.[11] ConsDoc:601. During the thirty-year period from 1982 through 2012, eight known human-caused grizzly bear mortalities occurred within or near the Cabinet Mountains portion of the Cabinet Yaak recovery area, six of which occurred within the action area. ConsDoc:663. From 2007-2012, there were three grizzly bear mortalities in the action area (one female, one male, one unknown), two human-caused and the other unknown. ConsDoc:613.

The Fish and Wildlife Service determined the influx of people and associated human-caused mortality risks constitute the Mine's "most prominent direct and indirect effects on grizzly bears." ConsDoc:648. The greatest effects are expected to happen over very short time frame when the Mine opens. ConsDoc:650, 652. "The existing human-caused mortality rate, given the small grizzly bear population, is not sustainable with or without the Montanore Mine." ConsDoc:674. "Female mortality has been about 60 percent of total mortality among the adult and sub-adult age classes. The loss of these females affects the

---

[11] Human-caused bear mortality is occurring at a disproportionally higher rate on private land. ConsDoc:601.

53

population's ability to grow."[12] ConsDoc:595. In light of the low population

numbers in this area, the management "goal for human-caused mortality is zero."

ConsDoc:594 (discussing the six recovery criteria). Considering this mortality

data, the Fish and Wildlife Service determined:

> Based on existing levels and causes of grizzly bear mortality in the
> Cabinet Mountains and [Cabinet Yaak recovery area], the proposed
> action, expected improvements in the environmental baseline due to
> implementation of the full complement of conservation measures in the
> mitigation plan, we estimate that impacts of the proposed action would
> result in no more than one grizzly bear mortality over the 30-year life of
> the mine.
>
> . . .
>
> [W]e analyzed the worst case scenario where the one human-caused
> mortality associated with the mine would be a female bear.
>
> . . .
>
> We expect that the mitigation plan conservation measures would prevent
> the human-caused mortality of more than one female grizzly bear over
> a 30-year period.

ConsDoc:664.

As was the situation with bull trout, consideration of the Fish and Wildlife

Service's grizzly bear analysis is guided to some degree by *Rock Creek II* and

*Rock Creek Alliance*. In the biological opinion at issue in *Rock Creek II*, the Fish

and Wildlife Service reached the same conclusion as it did here: the project at

issue was anticipated to cause the loss of no more than one bear and protect at

---

[12] Sub-adult bears are those aged 2-4 years. ConsDoc:597.

least one bear. *See* LIT-042317, 42324-25 (Rock Creek Biological Opinion

(2006)). The Rock Creek biological opinion also noted the same lack of empirical

data. *See* LIT-42323. As argued by Plaintiffs, those portions of the Rock Creek

biological opinion were not challenged as the Rock Creek plaintiffs focused their

arguments on the acquisition and calculation of mitigation acreage. *See* 703 F.

Supp. 2d at 1207-11. The defendants' attempt to use this Court's tacit approval in

the Rock Creek context as grounds for its ESA-compliance is unpersuasive.

Although the agency does not have a duty to address potential tension "between

current and earlier factual determinations in marginally related administrative

actions," *Humane Soc'y of U.S.*, 626 F.3d 1040, 1051 (9th Cir. 2010), the Rock

Creek biological opinion's no-jeopardy conclusion was based, at least in part, on

the abandonment of the Montanore Project, *see* LIT-42234, 42327, 42342 (noting

that agency initially reached a jeopardy conclusion for the grizzly bears in a 2000

biological opinion, but that since then "[t]he withdrawal of the Montanore Mine

project represented a significant improvement in the baseline for grizzly bears

within the action area and within the entire Cabinet Mountains").

    Plaintiffs first challenge the specificity of the Fish and Wildlife Service's

loss calculation. Plaintiffs argue that it is arbitrary and capricious for an agency to

make a precise calculation where it also admits it does not have the data to do so.

Although the Fish and Wildlife Service did not ignore mortality data, *see* ConsDoc:595-602, 662-63, 689, it conceded that there is no empirical evidence to accurately predict the number of bears affected by the Project, ConsDoc:662. But Federal Defendants argue the agency only needs to quantify take numerically based on available, not perfect, data. They are correct that the agency is tasked with "filling the gaps in scientific evidence" and that courts "must respect the agency's judgment even 'in the face of uncertainty.'" *San Luis*, 747 F.3d at 633 (internal quotation marks omitted). Nevertheless, Plaintiffs are also correct that such deference does not explain the figure the agency produced. Although reinitiation is required if take exceeds the anticipated one bear mortality, *see* ConsDoc:689, that safeguard alone cannot make up for the leap in logic taken by the agency. The Fish and Wildlife Service's precise prediction is arbitrary and capricious in light of its admission that it does not have the data to make such a prediction. *Cf. Rock Creek II*, 703 F. Supp. 2d at 1180-81 (arbitrary and capricious finding where agency relied on evidence it identified as "inadequate"); *compare with Swan View Coalition*, 2008 WL 5682092, at *18 (holding agency's failure to consider project's likely contributions to bear mortality not arbitrary and capricious because agency concluded project not likely to result in mortality).

Plaintiffs further challenge the Fish and Wildlife Service's mitigation

56

conclusions. Plaintiffs do not dispute that the types of conflict-reduction measures

in the mitigation plan may help to reduce human-caused mortality risks. (Doc. 54

at 31.) Rather, they challenge the degree to which those measures will be effective

given the agency's specific jeopardy conclusion and the fact that a number of

measures are already in use, but have not reduced mortality. As was the case in

*Rock Creek II*, "[u]nder current conditions it is difficult to imagine how action that

results in anything other than net improvement for grizzly bears can survive

scrutiny under the ESA." 703 F. Supp. 2d at 1205-06. The defendants argue a net

benefit is exactly the result here. Federal Defendants assert Plaintiffs' challenge

boils down to a disagreement over data interpretation, not the agency's failure to

consider the necessary data. Plaintiffs insist that the no-jeopardy determination

cannot be based on speculation that the Mine's mitigation measures will

conveniently cancel out all costs.

As discussed by the Ninth Circuit in *Selkirk Conservation Alliance v.

Forsgren*, an agency can and should consider binding mitigation measures when

evaluating the impact of a proposed action. 336 F.3d 944, 956 (9th Cir. 2003).

And, so long as the agency conducted a reasonable evaluation of the relevant

information and reached a conclusion that, although disputable, is not arbitrary

and capricious, that decision should be upheld. *Id.* at 956-57. Here, the

Biological Opinion includes a comprehensive mitigation plan, including securing 5,427 acres of habitat to offset habitat loss and disturbance, FS6-10.1:10862 (Table 4); ConsDoc:630, 647; reducing open and total motorized route densities and creating 7,030 acres of secure grizzly bear core habitat, ConsDoc:640-42; improving key linkage zones and population connectivity via habitat acquisition, access management, and adaptive management, ConsDoc:664-71; funding and implementing an array of actions that address human-caused mortality, including management of attractants throughout the recovery zone, road and trail access measures, mine transportation management, educational and outreach programs, funding for grizzly bear specialist, law enforcement, and habitat conservation specialist positions, ConsDoc:640, 654-61; and funding extensive monitoring and use of an Oversight Committee for plan implementation, ConsDoc:685.

Federal Defendants insist the effectiveness of the proposed mitigation plans is borne out in the record. *See, e.g.*, LIT-23890 (public education and management actions "can reduce bear attractants and conflict-related mortalities within linkage zones"); LIT-10504 (increase of Yellowstone population facilitated by "[s]uccessful long-term community involvement"). And, according to Federal Defendants, the mitigation plans contain actions recognized by grizzly bear experts to be effective. *See* ConsDoc:656, 625-29. The Biological Opinion

58

identifies the "greatest advancement in the management of problem bears has been the development of bear management specialist positions." ConsDoc:659.

Plaintiffs argue, however, that the mitigation measures proposed under the Project are the same as those already implemented in the ecosystem that have not reduced the number of human-caused mortalities. The parties dispute whether human-caused mortality in the Cabinet-Yaak reduced from 2001-2006 to 2007-2012, when certain conservation measures were first implemented. *See* LIT-13366-67 (Table 1: mortality 1982-2012); LIT 635-653 (Bear Management Report (04/04/2013)). Regardless of who is correct, however, the fact that the number of mortalities with these mitigation measures in place is, at best, the same as it was prior to their implementation, undercuts the agency's blanket reliance on their efficacy to more than make up for the Mine's negative impacts. By not considering the potential inadequacy of these proposed measures, the agency failed to consider an important aspect of the problem. That omission is particularly acute because of the enormous reliance the Fores Service places on the success of those mitigation measures to off-set mortality. *See* ConsDoc:663 (recognizing that no measure can entirely eliminate risk to bear mortality). The agency's no jeopardy determination for grizzly bears is arbitrary and capricious.

59

## III. Forest Service (Counts V, VI)

Finally, Plaintiffs argue that, by relying on the Fish and Wildlife Service's unlawful conclusions, the Forest Service also violated the ESA. Under ESA § 7, the Forest Service has an independent obligation to ensure that actions it authorizes, such as the Montanore Project, will not jeopardize listed species or destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127-28 (9th Cir. 2012) ("[A]n agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed or by failing to discuss information that would undercut the opinion's conclusion.").

Here, the Forest Service relied on the Aquatic and Terrestrial Biological Opinions discussed above to conclude that the Project will not jeopardize bull trout or grizzly bears or destroy or adversely modify bull trout critical habitat. *See* ROD, FS6:10.1-10579-80 (concluding that "determination is based on the review of the data presented in the Biological Opinions and the Final EIS"); JFEIS, Vol. 1. Because the Biological Opinions' no-jeopardy conclusions as to bull trout and grizzly bears were flawed, the Forest Service's reliance on those flawed biological opinions was arbitrary and capricious in violation of the ESA. *Ctr. for Biological Diversity*, 698 F.3d at 1127-28. Even though Federal Defendants argue

60

temperature and sediment data was analyzed after the biological opinions were issued, *See* FS10-231:13362, 13363-78, 133306, 13320-21, that evidence does not diminish the Forest Service's reliance on the biological opinions and is insufficient to independently support a no jeopardy determination.

CONCLUSION

Accordingly, IT IS ORDERED that the parties' motions for summary judgment (Docs. 35, 44, 48) are granted-in-part and denied in part. Plaintiffs' motion (Doc. 35) is GRANTED as to Counts I, III, IV, V, and VI. The defendants' cross-motions (Docs. 44, 48) are GRANTED as to Count II. This matter is REMANDED to the agencies for further review consistent with this Order.

Dated this *30* day of May, 2017.

17:01 PM

Donald W. Molloy, District Judge
United States District Court